UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TRACY E., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18 CV 1698 (JMB) |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration. The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On September 25, 2015, plaintiff Tracy E. filed an application for a period of disability

and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*. (Tr. 160-61). On November

4, 2016, she filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381

*et seq.* (Tr. 175-80). In both applications, she alleged disability beginning on September 23,

2015, which she subsequently amended to April 19, 2015. (Tr. 162-63). After plaintiff's

applications were denied on initial consideration (Tr. 91-95), she requested a hearing from an

Administrative Law Judge (ALJ). (Tr. 96-97).

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner
Nancy A. Berryhill as the defendant in this suit.

Plaintiff and counsel appeared for a video hearing on October 12, 2017. (Tr. 42-77). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Barbara Myers, M.S. The ALJ issued a decision denying plaintiff's applications on January 26, 2018. (Tr. 16-29). The Appeals Council denied plaintiff's request for review on August 7, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.    Disability and Function Reports and Hearing Testimony

Plaintiff was born in July 1965 and was 49 years old on the amended alleged onset date. She lived with her husband and children. (Tr. 231). She graduated from college. (Tr. 220). In a report of her work history, she stated that she previously worked as a consultant to a family business for 14 years, an expeditor and receiving coordinator for nine months, a college instructor for five years, and a transportation planner for three years. She also worked as a material analyst for one month in August 2015. (Tr. 207).

Plaintiff listed her impairments as bipolar affective disorder, anxiety and panic attacks, major recurrent depression, and arthritis. (Tr. 219). In her November 2015 Function Report[2] (Tr. 230-40), plaintiff stated that she was unable to concentrate or focus and she felt overwhelmed. She spent her days feeling worried and anxious while trying to focus on her tasks, such as getting her children off to school. Before her illnesses, she used to be able to make decisions, complete tasks, hold down a job, and enjoy herself. She alternated between sleeping too much and not enough and was not motivated to bathe or care for her hair. She needed

---

[2] Plaintiff's significant other helped her complete the form. This man, with whom plaintiff has two children, is variously described in the record as her husband, partner, and boyfriend. For consistency's sake, the Court will refer to him by his first name, Kevin.

reminders to take care of her grooming but not to take her medications. She prepared meals daily. She enjoyed spending several hours each day on household projects and gardening but it was hard to complete any one project because she had too many started at one time. Her hobbies and interests included animals, reading, music, and travel. She was able to drive, go out by herself, go shopping, and manage financial accounts. She helped her children with homework and interacted with Kevin and her parents. She did not have trouble getting along with others unless she was depressed or manic. She followed written and spoken instructions very well. She could manage stress if she was medicated but found it hard to "keep changing routines." (Tr. 236). When she was manic or depressed she tended to focus on death and engage in frequent handwashing and checking. She occasionally used a brace for her knees. Plaintiff had difficulty with squatting, bending, standing, walking, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, and understanding. Her medications caused nausea, headaches, and mood swings.

In September 2015, plaintiff listed her psychotropic medications as Effexor, Prozac, Seroquel, Sertraline, and Wellbutrin. (Tr. 222). In November 2016, plaintiff listed her medications as Vraylar, olanzapine-fluoxetine, and lithium carbonate. (Tr. 277). In August 2017, she was taking olanzapine-fluoxetine and lithium carbonate, along with benztropine to address involuntary movements the psychotropics caused. (Tr. 283).

Plaintiff testified at the October 2017 hearing that she had had over 50 jobs. She stated that her most recent attempts to work "kicked in" her mania and caused poor sleep, reduced eating, and "funny" behavior. (Tr. 56). At her last job, there was a trash bin fire that caused her to "freak out." (Tr. 57). She had been taking prescribed medications, but they stopped working after a while. She tried different psychiatrists and medications, but still experienced poor sleep,

daily crying, and poor focus. (Tr. 58). It took about a year of trying different medications to "get halfway . . . able to cope." At the time of the hearing, she stated, she was still unable to concentrate. When she experienced mania, she started multiple projects that she did not finish before moving on to another one. She described herself as more depressed at the time of the hearing, which also caused difficulty with focus and memory. (Tr. 59-60). She testified that there was a year in which she "didn't hardly go anywhere" and "pretty much stayed in bed most of the time," unable "to cope with life." At the time of the hearing, she was able to go to the grocery store but still did not feel well enough to work on any projects. She stated that it was "too hard to do things" and that she would rather just go back to bed. When asked to explain what was "too hard," she responded that she could not focus on anything and was unable to finish any projects she started. As an example, she stated that her family had recently moved and she found it overwhelming to unpack boxes and put the contents away.[3] (Tr. 60-61). When asked about her psychiatrist's observations that she had improved, plaintiff agreed that she had improved in that she was not suicidal, no longer had the shakes, and could go to the grocery store. (Tr. 62). Nonetheless, she did not believe she was able to return to work because she was "too scatterbrained." (Tr. 62-63).

Plaintiff's typical day consisted of driving her daughter and son, ages 16 and 9, to their schools and then trying to do some light chores. (Tr. 63). Usually, however, she was too tired and went back to bed and listened to the radio or slept until 11:00 or noon. She left the house at 2:30 to pick up her children and helped with their homework if needed. Kevin usually cooked dinner because she was not a good cook. She swept sometimes but had not done laundry in months. (Tr. 64). She was not motivated to do chores and typically spent eight hours a day in

---

[3] Treatment notes indicate that plaintiff and her family moved before March 1, 2017, more than seven months before the hearing. (Tr. 411)

bed. (Tr. 65). She started something and then experienced frustration and walked away. She no longer felt motivated to garden and lacked the focus to read. (Tr. 67). She estimated that she could focus on an assigned task for about 15 minutes. (Tr. 68). She stated that, even with menial tasks, like putting stickers on items, she would start to worry that she had missed some and lose focus. She did not bathe or change her clothes every day. (Tr. 66).

When asked by the ALJ why she had not stopped drinking alcohol as her doctors directed her to do, she denied knowing that she had been told to do so. At the same time, she stated that she had cut down. (Tr. 69).

Vocational expert Barbara Myers was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who had no exertional limitations but was limited to simple, routine tasks, with only minimal changes in job setting and duties; who could not have contact with the general public or handle customer complaints; could occasionally have contact with supervisors and coworkers; and could not perform fast-paced production work. (Tr. 71). According to Ms. Myers, such an individual would be unable to perform plaintiff's past work as a rate clerk, billing checker, invoice control clerk, and administrative clerk. Other jobs were available in the national economy, such as salvage laborer, merchandise marker, and cleaner housekeeper. (Tr. 71-72). These jobs would be precluded if the individual were unable to maintain attention and concentration for two-hour segments, remember simple routine instructions for two-hour segments, complete simple tasks, or missed work more than one day a month. (Tr. 73-75).

### B. Medical Evidence

Between May 2014, when the medical records in this matter begin, and December 7, 2015, plaintiff received treatment for her psychiatric disorders from Adam J. Sky, M.D., and

Theresa Kormos, AP/MHCN.  She also had two brief psychiatric hospitalizations during this period.  In January 2016, she transferred her care to Luis Giuffra, M.D., Ph. D.

According to treatment records from Dr. Sky and Ms. Kormos, plaintiff was generally stable between May 2014 and early August 2015.  (Tr.  347, 345, 344, 343).  She was diagnosed with bipolar affective disorder, stable, and history of alcohol abuse.  Minor modifications were made to her prescriptions in response to her insurance or ability to pay.  She was regularly advised to reduce her daily consumption of four or five beers.

On August 10, 2015, plaintiff called Dr. Sky and said she felt "manic again" and admitted that she had not been taking her medications reliably.  <u>Id.</u>  She was advised to take her prescriptions as directed.  On August 19th, plaintiff's mother called and reported that plaintiff was manic, angry, and unable to carry on a conversation.  Dr. Sky directed plaintiff to take one dose of Seroquel right then and a second dose in the evening and to recontact him in the morning.  <u>Id.</u>  The following day, Kevin reported that plaintiff seemed worse and was asking who he was, whether her parents were dead, and uttering random words.  (Tr. 342).  Noting that plaintiff had a manic episode in 2011, Dr. Sky directed plaintiff's family to take her to the emergency room.  She was admitted to St. Mary's Hospital for two days.  (Tr. 297-337).

Plaintiff's mother told hospital staff that plaintiff had trouble remembering when she had taken her medications and had been noncompliant with her medications over the prior two weeks.  (Tr. 316).  She had taken an extra dose of Seroquel the day before, as instructed by Dr. Sky, but it was unclear how much additional Seroquel she actually took or whether she had taken any other medication.  At admission, plaintiff blurted out random words and phrases and laughed inappropriately.  She had reduced appetite, slept only three hours a night, and was anxious.  (Tr. 297-98, 313).  She was described as very pleasant with poor concentration and poor insight and

difficulty staying focused during conversation. (Tr. 301, 316). It was noted that she became agitated when her parents were in the room and repeatedly shouted "get away from me, Dad," in her sleep. (Tr. 300). On August 21, 2015, psychiatrist Sabina Morga, M.D., noted that plaintiff denied having any desire to harm herself or others. (Tr. 323-24). She admitted that she might have mixed her medications with alcohol and marijuana. She had a "fairly reactive affect" and did not appear depressed. She denied feeling hopeless, helpless, worthless, or useless. She did have difficulty concentrating and became tearful when speaking of a brother who died at age 5 of leukemia. Her behavior was appropriate. She was discharged on August 21st, with recommendations that she apply for disability and Medicaid. (Tr. 302).

On August 24, 2015, plaintiff told Dr. Sky that she had been without Seroquel for three or four days. (Tr. 341). She reported that she could not sleep, had decreased appetite, and was experiencing panic attacks. Her affect was sad and crying. She was restarted on 400 mg. of Seroquel XR. On September 1, plaintiff reported that she was a lot better, but that Kevin had been in and out of the emergency room for the past week and was now in the hospital. (Tr. 340). Her appetite had improved and she had not had any panic attacks, although she was anxious. It was observed that she was alert and oriented and that her affect was bright. She was more on task, but had "some disorganization with papers she was carrying." Her dosage of Seroquel was reduced to 300 mg. Two weeks later, plaintiff was described as "better," with decreased anxiety and less stress since Kevin was no longer in the hospital. (Tr. 339). She reported that she was shopping impulsively but was not in danger of going into debt because she was shopping at the dollar store. She was alert and oriented, with bright affect and normal speech. She seemed slightly better organized. She was drinking two to three beers a night and was told to reduce her alcohol consumption. She continued on 300 mg. of Seroquel and 200 mg. of Zoloft.

Kevin accompanied plaintiff to Dr. Sky's office on October 13, 2015. (Tr. 358). Plaintiff was paranoid and thought her credit card was tracking her. She was not sleeping and got agitated and verbally abusive. She was drinking three beers at a time and wanted to reduce her Seroquel dosage. On mental status examination, she was alert and oriented, with labile affect and reduced insight. She spoke in short sentences. She was diagnosed with bipolar affective disorder with psychosis and alcohol abuse. Her Seroquel dosage was increased to 400 mg. Later that day, she was found lying in the grass at home and stating that she had bugs and tracking devices in her uterus. (Tr. 370). She had suicidal and homicidal ideation. She was given an injection of the antipsychotic Geodon and transferred to St. Mary's Hospital for admission. (Tr. 367-78). She reported having visual and auditory hallucinations along with the sensation of something moving in her abdomen that she described as a bug or tracking device. (Tr. 370). She had been experiencing these symptoms for a week or so but had become frightened by something on this particular day. She denied experiencing manic symptoms, depression, or anxiety. On mental status examination, plaintiff was alert and oriented, pleasant and cooperative, and in acute distress. (Tr. 373). She was neatly dressed and well groomed and made good eye contact. Her mood was fearful and her affect labile. Her insight and judgment were impaired. She acknowledged intermittent use of alcohol and marijuana. Drug screens were negative for tested substances with the exception of marijuana. (Tr. 375). The day after her admission, she denied having hallucinations or delusions and was able to contract for safety, so she was discharged against medical advice. (Tr. 377-78). Her insight and judgment remained impaired, however, and her thought processes were circumstantial, and her affect was reactive. Her prognosis appeared "questionable" and depended on community support, medication management, and psychotherapy.

On October 16, 2015, Dr. Sky noted that plaintiff was still psychotic. (Tr. 357). She thought she had a tracking device in her forehead and was being tracked by her credit cards and still felt movement in her lower abdomen. On mental status examination, she was alert and oriented, with a brighter affect, and was able to respond to joking, but she "still really believe[d]" the delusions.[4] She was diagnosed with bipolar affective disorder with psychosis and history of alcohol abuse. She was provided with samples of 400 mg. of Seroquel XR. Dr. Sky noted "no improvement" on October 23rd. (Tr. 356). Kevin reported that plaintiff had not slept the night before and had had three beers. She had been walking around outside at night and rearranging the house without actually completing it. She spoke less about her delusions but still felt she had an electromagnetic tracker. On mental status examination, she was alert and oriented, with somewhat labile affect. She was irritable and talked over Kevin. She was diagnosed with bipolar affective disorder with psychosis and alcohol abuse. Her Seroquel dosage was increased to 600 mg. She was directed to avoid alcohol but refused a prescription for Campral to assist in stopping alcohol use, stating that she wanted to wait until her mood stabilized.

On November 5, 2015, plaintiff reported that she was "good," but complained that there was "more and more to do" and she couldn't catch up. (Tr. 355). She had racing thoughts but decreased delusions. She had had two beers the night before and had decreased her Seroquel to 400 mg. She was diagnosed with bipolar affective disorder, hypomanic, psychosis, improving. Her lack of insurance limited her medication options and she was prescribed Latuda, 40 mg., with the possibility of being able to discontinue Seroquel. On November 13th, plaintiff reported that her mood was more stable with Latuda and she pronounced herself to be "better." (Tr. 354). She was still unorganized but had no delusional thinking. She was prescribed Latuda 40 mg.,

---

[4] The ALJ read the treatment note as saying that plaintiff was "between delusions." (Tr. 24).

Seroquel XR 400 mg., and Zoloft 200 mg. On December 7, 2015, Dr. Sky noted that plaintiff felt the Latuda was helping and that she had been able to cut back on Seroquel. (Tr. 360-61). On mental status examination, plaintiff was oriented, well-groomed and cooperative, with intact thought processes and content. She had no delusions or hallucinations and her memory, insight, and judgment were intact. Even though plaintiff was "still imbibing some," Dr. Sky assessed her as compliant with treatment recommendations and suggested she return in three months. He also noted, however, that she was likely to be going to a clinic soon.

Plaintiff began treatment with Luis Giuffra, M.D., Ph.D., on January 21, 2016. (Tr. 425-26). She reported that she had been diagnosed with depression in 1989, and with bipolar disorder in 2011. When she was manic, she had increased activities, decreased sleep, racing thoughts, and irritability. At present, she was down and apathetic, with decreased motivation. She complained of feeling "bad all the time," with crying spells, death wishes, and increased sleep and appetite. She reported that she drank four to five beers a day and was diagnosed as an alcoholic. On mental status examination, plaintiff was dysphoric, tearful, and cooperative. She had poor grooming. Her insight and judgment were fair. Dr. Giuffra diagnosed her with bipolar I disorder and alcohol abuse or dependence. He increased the dosage of Latuda, decreased Zoloft, and added lithium. At follow-up on February 18, 2016, plaintiff stated that she was a little better and felt calmer, but she still barely wanted to get out of bed. (Tr. 424). She had decreased crying, but increased passive death wishes, stating that she did not "want to deal with [her] life."[5] She drank one beer on rare occasions and denied marijuana use. She had gotten required blood work done. On mental status examination, plaintiff was well-groomed, tearful,

_____

[5] Dr. Giuffra noted that Kevin suffered from cyclical vomiting syndrome and had not worked since 2002. The family was facing foreclosure on their house.

and dysthymic.  Her speech, flow of thought and content of thought were all unremarkable and her sensorium was clear.  She continued on Latuda, Zoloft, and lithium.

In March 2016, Dr. Giuffra noted that plaintiff continued to improve but faced ongoing life stressors which made it hard for her to feel well.  (Tr. 423).  She reported that her family had no income and she had no job prospects.  Dr. Giuffra noted that plaintiff was unable to work at an employable pace.  She was attending a support group once a week.  On mental status examination, she had dysthymic affect and decreased grooming.[6]  Her speech, thought, and sensorium continued to be unremarkable.  Her blood tests were "ok."  Plaintiff's medications remained unchanged.  In April 2016, plaintiff reported that she was not doing well and was "pretty down."  (Tr. 422).  Dr. Giuffra noted that plaintiff was tearful with decreased grooming, down mood, fair appetite, decreased crying spells, and dysthymic affect.  She had fleeting suicidal ideation but no plan or intent.  She was drinking two beers a day and denied marijuana use.  She was anxious about the future and the fact that the family was "starting to run out of money."  Plaintiff was seeing a therapist and attending a support group.  Dr. Giuffra increased the dosage of Latuda, added Celexa, and continued the lithium and Zoloft.  In May 2016, she reported that she was better in that she was less depressed and less worried but she was still not doing much.  She did not have suicidal ideation.  (Tr. 421).  She denied using marijuana or having problems with alcohol.  Dr. Giuffra noted that plaintiff had decreased grooming and was still mildly dysthymic.  Her medications were continued without change.  Plaintiff's presentation was similar in June 2016, with decreased grooming and motivation.  (Tr. 420).  She reported that it was hard to take care of herself.  Her parents found her to be more balanced in that she had

---

[6] The ALJ incorrectly summarized Dr. Giuffra's notes between February 28, 2016, and September 13, 2017, as indicating that plaintiff was "well dressed and groomed."  (Tr. 24).  In actuality, Dr. Giuffra routinely noted that plaintiff had decreased or poor grooming.

no mania but her self-care had decreased. Dr. Giuffra discontinued Zoloft. In July 2016, plaintiff reported she felt "about the same," but that her parents thought she had improved. She had decreased grooming, initial insomnia, and fleeting death wishes. Her affect was dysthymic and she had some muscle tremors. Dr. Giuffra prescribed Symbyax, Latuda, and lithium. (Tr. 419).

On August 9, 2016, plaintiff reported that everything was "ok," but she "didn't feel that good." (Tr. 417). She had decreased appetite, flat mood and dysthymic affect, and decreased grooming. She was no longer seeing the therapist or attending group therapy. Dr. Giuffra discontinued Latuda and added Vraylar. Plaintiff was to return in five weeks but came with Kevin on August 30, 2016. (Tr. 416). She reported that she was "okay," but "still depressed, kind of." Kevin described her as "pretty good" and not manic. She was listless, however, and stayed quiet and had decreased self-care. She was not crying. Dr. Giuffra noted that plaintiff's affect was dysthymic and blunted, and her grooming was decreased. In addition, she had tremors and was walking slowly. She had not gotten blood work done. Dr. Giuffra discontinued Vraylar and prescribed Cogentin to address extrapyramidal symptoms.

In October 2016, plaintiff reported that she felt better and was in pretty good spirits. (Tr. 415). She continued to have a dysthymic affect and decreased grooming. Her labs were okay. In November 2016, Kevin and plaintiff reported that she continued to improve but still had some mood swings. (Tr. 414). She did not have any mania but was anxious over dealing with other people and spent time in her room. She was worried about the family losing their home to foreclosure. She had gained some weight and continued to have decreased grooming and dysthymic affect. She reported gasping for air while sleeping and Dr. Giuffra referred her for a sleep study. In December 2016, plaintiff reported that they were losing their home of 16 years

and that her parents might buy a house in the same school district for them. (Tr. 413). She reported that it was "very hard" to shower and take care of her grooming. She did not follow up on the sleep study. Dr. Giuffra described plaintiff as dysthymic, anhedonic, tearful, and poorly groomed. Plaintiff continued to attend the peer-to-peer group and Dr. Giuffra referred her to a therapist.

In January 2017, plaintiff and her family described her as "better" but she still spent a lot of time in bed sleeping. (Tr. 412). Her grooming and motivation were decreased. She was starting to drink more but denied negative consequences. She was still too impaired to work and felt guilty that she did not "do much." She was not seeing a therapist but was attending the peer-to-peer group. Dr. Giuffra noted that her dysthymia was milder. On March 1, 2017, plaintiff continued to improve and said that she felt better. (Tr. 411). The family had moved to a new house bought by her parents, but remained financially insecure. They did not have money for car insurance and received food stamps. On mental status examination, she had decreased grooming and said that she showered once a month. She reported drinking one or two beers and using marijuana once in a while. Her dysthymia was milder. Dr. Giuffra once again referred her to a therapist. In April 2017, plaintiff stated that "[e]verything is ok" and that she was not depressed, although she continued to have decreased motivation and her grooming remained poor. (Tr. 410). She was drinking one or two beers every day. On June 14, 2017, Dr. Giuffra noted that plaintiff was euthymic. She was driving without car insurance and thought there was an outstanding warrant for unpaid city taxes. She drank two to four beers a day. She failed to keep her appointment on August 16, 2017. (Tr. 408).[7] She was mildly dysthymic in September 2017 and there had been a slight improvement in her grooming. (Tr. 407). She was still drinking one

_____

[7] The ALJ stated that plaintiff "missed some of her appointments" with Dr. Giuffra. (Tr. 25). The August 2017 appointment is the only one Dr. Giuffra identified as missed.

to two beers a day and using marijuana occasionally. She had stopped attending the peer-to-peer group and was not seeing a therapist.

###    C.    Opinion Evidence

On February 3, 2016, State agency psychological consultant Linda Skolnick, Psy.D., completed a Psychiatric Review Technique form based on a review of plaintiff's medical record through December 2015. (Tr. 82-85). Dr. Skolnick concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.09 (substance addiction disorders). She opined that plaintiff's allegations were mostly credible and that she had established medically determinable impairments for which she had been in treatment. Dr. Skolnick wrote:

> [Plaintiff] appeared to be stable in late 2014 until she decompensated in 8/2015. At that time, she was not reliably taking her medication. She was hospitalized in 8/2015 and then again in 10/2015 with delusions and hallucinations noted in 10/2015. She has had some medication adjustments since her last hospitalization, was improving by 11/2015 and at her most recent med check presented with normal mental status and reported that medication has been helpful. Her condition may be exacerbated by DAA [drug and alcohol abuse]. However, a decision regarding materiality is not necessary as she is not considered disabled. It appears that when she is medication compliant, she stabilizes and her functioning improves. Given the recency of her decompensation, the question of whether the additional stress of work may result in another decompensation must be considered. However, given her prior history of stability when medication compliant, it seems reasonable to conclude that with reduction in task complexity and social demands, she should be able to work.

(Tr. 84).

Dr. Skolnick also completed a mental residual functional capacity assessment. (Tr. 85-87). Dr. Skolnick opined that plaintiff was moderately limited in the abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and work in coordination with or proximity to others without being distracted by them. In addition, she had moderate social interaction limitations in the areas of working with the

14

general public, accept instruction and respond appropriately to criticism from others, and get along with coworkers without distracting them or exhibiting behavioral extremes. In summary, Dr. Skolnick opined, plaintiff retained the capacities to understand and remember at least simple instructions; to concentrate and persist on at least simple tasks; and to interact socially and adapt in a simple work environment that does not require close interpersonal interaction with others or frequent changes. The ALJ gave great weight to Dr. Skolnick's opinion, noting that she was a "medical expert who had an opportunity to review the record in its entirety and her findings of limitations and opinions are consistent with the record as a whole, including later dated evidence showing continual improvement with adherence to medication and treatment." (Tr. 26).

Dr. Giuffra completed Mental Residual Functional Capacity questionnaires in October 2016, November 2016, and September 2017. (Tr. 389-93, 394-98; 399-403). In October 2016, Dr. Giuffra stated that plaintiff had severe bipolar disorder and became psychotic and required hospitalization. Her illness was chronic and she had alternating episodes of mania and prolonged depression. Her response to treatment was "fair" and her prognosis was "guarded." (Tr. 389). She was prescribed olanzapine, fluoxetine, and lithium to treat her psychiatric conditions and Cogentin to address the resulting "Parkinsonisms." In completing a checklist of plaintiff's signs and symptoms, Dr. Giuffra noted that different symptoms were present at different times, depending on whether plaintiff was depressed or manic. (Tr. 390). Her symptoms were anhedonia, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, psychomotor disturbances, persistent disturbances of mood or affect, emotional withdrawal or isolation, bipolar syndrome with a history of episodic periods of both manic and depressive syndromes, hallucinations or delusions, flight of ideas, manic syndrome, pressures of speech, memory impairment, and sleep

disturbance.  In an assessment of plaintiff's work-related mental abilities and aptitudes (Tr. 391-92), Dr. Giuffra stated that, as of September 2015, plaintiff was limited but satisfactory in the abilities to ask simple questions or request assistance, be aware of and take precautions against normal hazards, travel in unfamiliar places, and use public transportation.  She was seriously limited, but not precluded, in her abilities to carry out very short and simple instructions and make simple work-related decisions.  Finally, she was unable to meet competitive standards in the remaining 19 abilities, including getting along with the public and co-workers, dealing with stress, adhering to basic standards of neatness and cleanliness, and completing a normal work schedule without interruptions from psychologically based symptoms.  As a result of her impairments or treatment, plaintiff was expected to miss more than four days of work per month.  She was not a malingerer.

In November 2016, Dr. Giuffra listed plaintiff's diagnosis as bipolar disorder, depressed, with history of psychosis.  (Tr. 394-98).  She was presently taking Symbyax, (a combination of fluoxetine and olanzapine), as well as lithium and generic Cogentin.  She experienced fatigue as a side effect.  Dr. Giuffra cited plaintiff's low mood, anhedonia, increased sleep, low motivation, poor concentration, severe isolation, and poor grooming and self-care as clinical findings that demonstrated the severity of plaintiff's impairment.  Dr. Giuffra also modified the list of signs and symptoms he attributed to plaintiff by clarifying that several of her symptoms were present during the mania she experienced the prior year.  At present, she was no longer suicidal, but continued to exhibit symptoms consistent with depression, such as anhedonia, decreased energy and motor activity, and withdrawal or isolation.  He also revised downward his opinion regarding plaintiff's work-related abilities, opining that she was unable to meet competitive standards in all but three areas:  asking simple questions or requesting assistance; getting along with coworkers;

16

and using public transportation. (Tr. 396-97). Dr. Giuffra opined that plaintiff was "totally disabled for the foreseeable future," due to a "chronic and severe mental illness that includes episodes of psychotic mania requiring hospitalization and frequent episodes of bipolar depression (her current state)." She was likely to miss more than four days of work each month.

In September 2017, Dr. Giuffra noted that he had had 20 monthly office visits with plaintiff. (Tr. 399-403). She had shown a partial response to treatment for bipolar disorder and continued to experience fatigue as a side-effect of her medications. He again noted that she had "prolonged episodes of severe and debilitating depression and several episodes of full blown mania with psychosis, requiring hospitalization." Her prognosis remained guarded. Her signs and symptoms included anhedonia, appetite with weight change, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impairment in impulse control, mood disturbance, psychomotor disturbance, persistent disturbances of mood or affect, bipolar syndrome, hallucinations or delusions, emotional lability, flight of ideas, manic syndrome, illogical thinking, pressured speech, easy distractibility, sleep disturbance, and decreased need for sleep. With respect to her work-related abilities, he now assessed plaintiff as having some capacity — albeit seriously limited — to understand, remember, and carry out short and simple instructions, make simple decisions, and ask questions. She had satisfactory capacity to travel in unfamiliar places and use public transportation. She remained unable to meet competitive standards in 19 areas. According to Dr. Giuffra, she was unable to work consistently in any capacity due to her chronic and severe bipolar illness and was likely to miss more than four days of work each month.

The ALJ gave little weight to Dr. Giuffra's opinions that plaintiff was unable to perform substantial gainful activity. (Tr. 25). While noting that the uncontradicted opinion of a treating

physician is generally entitled to substantial weight, Dr. Giuffra was not a vocational expert and his criteria for determining plaintiff's capacity for work were not necessarily the same as those used by the Social Security Administration. In addition, the determination of whether an individual claimant is disabled "involves mixed medical, vocational and legal issues" and the ultimate issue is one reserved to the Commissioner. (Tr. 26). With respect to Dr. Giuffra's findings of limitations, the ALJ found that they were inconsistent with the record as a whole, including the clinical findings and signs within his own treatment records, including his notation that plaintiff was "consistently improving." Id. Another factor in the ALJ's assessment of Dr. Giuffra's opinion was his silence with respect to the impact of noncompliance, alcohol abuse, and marijuana use on plaintiff's ability to function, Finally, the ALJ stated, Dr. Giuffra's findings "seem to be based on her one episode of decompensation . . . . in late 2015, which was not of long duration and she improved from that episode in less than twelve months." Id.

### III. <u>Standard of Review and Legal Framework</u>

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. <u>See</u> <u>Baker v. Sec'y of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any

other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.

Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 16-29). The ALJ found that plaintiff met the insured status requirements through March 31, 2010 and had not engaged in substantial gainful activity since September 23, 2015, the alleged onset date.[8] (Tr. 19). At step two, the ALJ found that plaintiff had the severe impairments of bipolar affective disorder and alcohol abuse. The ALJ found that plaintiff did not have a medically determinable physical impairment and that her allegations of depression and anxiety were properly considered as aspects of her bipolar disorder, rather than as separate conditions. (Tr. 19-20). The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[9] (Tr. 14). Plaintiff does not challenge the ALJ's determination of her severe impairments.

The ALJ next determined that plaintiff had the RFC to perform a full range of work at all exertional levels but with nonexertional limitations. In particular, she was limited to work that did not involve fast-paced production and required only simple routine tasks with minimal changes in job setting or duties. In addition, she was restricted from any contact with the general public or handling customer complaints and could have only occasional contact with coworkers and supervisors. (Tr. 21- 27). In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's severe impairments could

---

[8] As noted above, plaintiff amended her alleged onset date to April 19, 2015. (Tr. 162-63).

[9] The ALJ analyzed the "paragraph B" criteria and found that plaintiff had moderate limitations in the functional areas of understanding, remembering or applying information; interacting socially; and sustaining concentration, persistence, and pace. She was minimally limited in the area of adapting to change and managing oneself. (Tr. 20). Plaintiff also did not meet the "paragraph C" criteria. (Tr. 21).

reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 27).

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work. Id. Her age on the alleged onset date placed her in the "younger individual" category. She had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether she had transferable job skills or not. The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as a salvage lab worker, merchandise marker, and cleaner. (Tr. 28). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from September 23, 2015 — the unamended alleged onset date — through January 26, 2018 — the date of the decision. (Tr. 27-28).

## V. <u>Discussion</u>

Plaintiff argues that the ALJ improperly weighed the medical opinion evidence. In particular, she asserts that the ALJ improperly discounted the opinions of treating psychiatrist Dr. Giuffra and improperly relied on the opinion of nonexamining psychologist Dr. Skolnick.

When evaluating opinion evidence, an ALJ is required to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. § 404.1527(e)(2)(ii). The regulations require that more weight be given

to the opinions of treating physicians than other sources.[10] 20 C.F.R. § 404.1527(c)(2). Similarly, more weight is given to examining sources than to nonexamining sources. 20 C.F.R. § 404.1572(c)(1). According to the regulations, the opinions of treating medical sources are given more weight because they are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016) (internal quotation and citations omitted). A treating physician's opinion, however, "does not automatically control or obviate the need to evaluate the record as a whole." Id. at 1122-23 (citation omitted). Rather, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (citation omitted).

Here, the ALJ gave several reasons for discounting Dr. Giuffra's opinions. The ALJ first asserted that the ultimate question of whether plaintiff is unable to engage in any substantial gainful activity is an issue reserved to the Commissioner. (Tr. 25-26). See Cox v. Astrue, 495

---

[10]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

F.3d 614, 619-30 (8th Cir. 2007) (although a claimant's RFC is a medical determination and thus must be based on some medical evidence, it is ultimately a determination reserved to the Commissioner). Plaintiff does not dispute this assertion as a legal principle but argues instead that the ALJ should have considered Dr. Giuffra's observations that plaintiff lacked the capacity to work consistently or at "an employable pace" (Tr. 403, 423) as observations within his area of expertise. Defendant does not address this argument and the Court deems the point conceded.

The ALJ also discounted Dr. Giuffra's assessment of plaintiff's limitations as inconsistent with the record as a whole without, however, identifying specific inconsistencies. The ALJ observed that Dr. Giuffra's opinions "seem based on [plaintiff's] one episode of decompensation in late 2015 which was not of long duration and she improved from that episode in less than twelve months." (Tr. 26). Indeed, Dr. Sky noted improvement in plaintiff's mania following her October 2015 hospitalization. (Tr. 360-61). But, plaintiff's bipolar disorder was manifested in both manic and depressive phases and, by January 2016, she was experiencing symptoms of depression, with crying spells, death wishes, and increased sleep. (Tr. 425-26). The replacement of the more florid manic symptoms[11] with the relatively subdued presentation of plaintiff's depression cannot fairly be characterized as an improvement.

The ALJ also stated that Dr. Giuffra's assessment of plaintiff's limitations was inconsistent with his own treatment records, which the ALJ described as showing consistent improvements. (Tr. 26). The Court disagrees with this characterization of Dr. Giuffra's treatment notes. Throughout the course of treatment, Dr. Giuffra noted plaintiff's blunted or dysthymic affect (Tr. 423, 422, 421, 419, 417, 416, 415, 414, 413, 407); fleeting suicidal ideation or death wishes (Tr. 424, 419); and listlessness and decreased motivation (Tr. 420, 416, 412,

---

[11] Significantly, plaintiff testified that her mania was "kicked off" by her efforts to work. (Tr. 56).

410). A year after starting treatment with Dr. Giuffra, plaintiff was still sleeping too much. (Tr. 412). With the exception of her first session with Dr. Giuffra, plaintiff routinely presented with poor grooming,[12] an observation that was consistent with reports from Kevin and plaintiff's parents (Tr. 416, 420); her November 2015 function report (Tr. 231); her statement in March 2017 that she showered once a month (Tr. 411); and her October 2017 testimony that she did not regularly bathe or change her clothes. (Tr. 66). This decrease in her grooming was a departure from her prior presentation to Dr. Sky and is consistent with plaintiff's depressed state. In March, April, and June 2017, plaintiff's mood had improved and she was spending less time in bed. (Tr. 411, 410, 407). According to plaintiff, she had improved in that she was no longer suicidal and could shop for groceries. (Tr. 62). Even with the improvement in plaintiff's mood, however, Dr. Giuffra still opined that periodic escalations in her illness would bar her from working. (Tr. 407). This opinion is consistent with Dr. Skolnick's earlier observation that "the question of whether the additional stress of work may result in another decompensation must be considered." (Tr. 84).

The ALJ also discounted Dr. Giuffra's assessment because he "did not note what effect [plaintiff's] non-compliance, alcohol abuse, or marijuana use might have on her ability to function." (Tr. 26). First, there is no evidence that plaintiff was noncompliant with Dr. Giuffra's prescriptions and the record shows that she delayed a single blood test and missed a single appointment. Even with a more obvious record of noncompliance, however, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor

---

[12] The ALJ asserted that Dr. Giuffra described plaintiff as well-groomed. (Tr. 24). The Court cannot say whether this misunderstanding of the record influenced the ALJ's assessment of Dr. Giuffra's opinion, but believes that plaintiff's inability to shower or wear clean clothes undermines the ALJ's determination that she had only minimal limitations in the area of adapting to change and managing oneself. (Tr. 21).

without a justifiable excuse.'" Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) (alteration in original, citations omitted).  The ALJ neglected to take into account the role played by plaintiff's mental illness and thus her purported noncompliance is not a valid basis for rejecting Dr. Giuffra's opinions.  See id. at 943 (history of substance abuse and non-compliance with recommended medications and treatment "is an improper basis to reject a treating physician's opinion").

The defendant suggests that Dr. Giuffra's opinions are not entitled to great weight because "they were rendered in a checklist form."  [Doc. # 24 at 7].  Dr. Giuffra's opinions were completed on five-page forms that had sections for written notes as well as lists where only check marks were required.  Dr. Giuffra provided plaintiff's diagnosis and the length and frequency of her treatment, discussed side effects, and described specific clinical findings that he relied upon to support his opinions.  While Dr. Giuffra's opinion could have been transmitted in a lengthier narrative format, the forms provide ample information to evaluate plaintiff's limitations.  See Sergey F. v. Saul, No. 18-CV-1276-KMM, 2019 WL 4740088, at *5 (D. Minn. Sept. 27, 2019) (stating that ALJ improperly rejected provider's opinion based on its format).

The Court finds that the ALJ's decision to discount Dr. Giuffra's opinions is not supported by substantial evidence in the record as a whole and this matter will be remanded for further consideration.

Plaintiff also challenges the ALJ's decision to give great weight to the opinion of State agency psychologist Dr. Skolnick.  As noted above, Dr. Skolnick reviewed records of plaintiff's treatment through December 2015, by which time plaintiff's manic symptoms had resolved but she had not yet begun treatment with Dr. Giuffra for her depressive symptoms.  On remand, the

ALJ will have the opportunity to reconsider the weight to be given to Dr. Skolnick's opinion and thus further discussion of this argument is not needed at this time.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of December, 2019.